IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>2002 BMW 745i, )<br>VIN WBAGL63422DP51620, )<br>)<br>Defendant )  | 8:10CV15<br><br><br><br><br><br>**TRIAL BRIEF** |

### Introduction

Pursuant to this Court's Order dated August 16, 2010 (Filing No. 22), the Plaintiff, United States of America, and the Claimant, Benjamin Kasper, are submitting the question of whether Mr. Kasper's vehicle, the Defendant property, is forfeitable to the United States on the transcript of a parallel court proceeding held in the District Court of Hall County, Nebraska, case number CR09-418, State of Nebraska v. Benjamin W. Kasper.

### Facts

On August 6, 2009, Jeff Wilcynski was a certified law enforcement officer and had been employed by the Nebraska State Patrol for approximately fourteen years. (Tr.6). He held the rank of Sergeant. (Tr.7). On that date, at approximately 9:42 p.m., Sgt. Wilcynski was on duty, in uniform and was driving a marked patrol car, eastbound on Interstate 80 in Hall County at approximately mile marker 305. (Id.). He noticed a blue BMW, the Defendant vehicle, in the lane right in front of him had slowed down to approximately fifty miles per hour. (Tr.8). As the

BMW and Sgt. Wilcynski entered into a construction zone, he noticed the BMW turn on its hazard lights and drive onto the shoulder. (Tr.9).

Sgt. Wilcynski got out of his patrol car and made contact with the driver, the sole occupant of the vehicle. (Id.) Sgt. Wilcynski asked the driver if everything was okay. The driver responded he had some car trouble. (Tr.10). He was receiving an error message on the dash of the vehicle, and it had stopped running. (Id.) Sgt. Wilcynski saw two cell phones, a road atlas and clothing hanging in the back seat. (Id.) The driver told Sgt. Wilcynski he had done some repair work at an interchange to the west of them. (Id.) He said he wanted to look under the hood. Sgt. Wilcynski then asked for identification. (Id.) The driver presented his driver license; it identified him as Benjamin Kasper, out of Illinois. (Tr.10-11).

Mr. Kasper got out of the BMW and both Sgt. Wilcynski and he went up to the front of it and opened the hood. Mr. Kasper said he had some belt trouble and he had just replaced a belt on the vehicle. (Id.) Sgt. Wilcynski believed the belt looked worn. He did not believe it was a new belt. (Id.) Mr. Kasper also said he was also having trouble with the alternator. The Sergeant asked if Mr. Kasper needed a tow truck. Mr. Kasper said he did not know.

Mr. Kasper tried to start the vehicle, but it would not turn over. He then asked the Sergeant to call a tow truck. (Tr.12). Sgt. Wilcynski did so. While the two of them were waiting, Sgt. Wilcynski asked Mr. Kasper if he had any documentation for the vehicle. (Id.) Mr. Kasper produced a manilla envelope which the two men perused as they stood between the BMW and the cruiser. (Id.) The contents of the envelope properly tied the car to Mr. Kasper. (Tr.13).

When Sgt. Wilcynski made his initial contact with Mr. Kasper, Mr. Kasper told him the police had been looking for him. (Tr.12-13). Mr. Kasper said he was to have been home the prior Monday (August 3, 2009). (Tr.13). He said his phone had died and his friends had called the police. (Id.)

Mr. Kasper said he been Reno, partying with some buddies. (Tr.14). He had been there for four days. (Id.) The Sergeant asked where all of his clothing was for a four-day trip. Mr. Kasper pointed to the backseat and said, "It's right there". (Id.) Sgt. Wilcynski said, "That doesn't look like very much clothing"; Mr. Kasper replied, "I'm a guy". (Id.)

Sgt. Wilcynski asked Mr. Kasper what was in the trunk. (Id.) Mr. Kasper said more clothing and other stuff. (Id.) The Sergeant asked if they could look in the trunk. Mr. Kasper agreed, and went up to the vehicle. (Id.) He tried to open the trunk, but it would not open. (Id.) The Sergeant asked whether there was button inside the vehicle, either in the glove box or on the dash, that could be utilized to unlock the truck. Mr. Kasper said he had already pushed that button, but the trunk still would not open. (Id.)

Sgt. Wilcynski asked Mr. Kasper if he could have canine come to their location and go around the vehicle, sniffing for drugs, while they waited for the tow truck. (Tr.15). Mr. Kasper said yes. (Id.) The Sergeant also asked for consent to search the vehicle. Mr. Kasper agreed to that. (Id.) Sgt. Wilcynski directed Mr. Kasper to stand by the cruiser, which he did, and then the Sergeant began to search the vehicle. (Id.) He started in the passenger compartment, and found nothing of significance to him. (Id.)

Nebraska State Patrol Trooper Bauer arrived on the scene. He stood back with Mr. Kasper while Sgt. Wilcynski conducted the search. (Id.) The Sergeant was trying to access the

3

trunk. The buttons on key fob did not open the trunk, and though there was a hook on the fob to hold a key to open the trunk, there was no key on that hook. (Id.) While Sgt. Wilcynski was concentrating on opening the trunk, Trooper Bauer told him what Mr. Kasper had told Trooper Bauer about the trip. Mr. Kasper said he was coming from Reno, and had been there for a car show. (Tr.16). Mr. Kasper also told Trooper Bauer the name of the hotel where he had stayed in Reno. (Id.) Trooper Bauer did not believe such a hotel was Reno; however, Trooper Bauer later told Sgt. Wilcynski he had been wrong about that. (Id.)

While Sgt. Wilcynski was still trying to open the trunk, Trooper Bauer approached him a second time. (Id.) Trooper Bauer said Mr. Kasper wanted the search stopped. (Id.) Sgt. Wilcynski did stop searching. (Id.)

Sgt. Wilcynski called his dispatch and asked to have a canine sent to his location. (Tr.18). Approximately fourteen minutes later, Nebraska State Patrol Trooper Russell Lewis, and his police service dog, Bruno, arrived at the scene. (Id.) Trooper Lewis deployed his dog, then signaled to Sgt. Wilcynski the dog had indicated to the odor of controlled substance coming from the vehicle. (Id.) Sgt. Wilcynski communicated that to Mr. Kasper, and then again started searching the vehicle. (Tr.19). This time, the Sergeant reviewed the owner's manual, because he was trying to determine how to open the trunk. (Id.) The manual informed him there was a lock switch inside the center console which would lock the trunk so nothing would open it accept for the key. (Id.) The Sergeant then tried to open the center console, but it was also locked. (Id.) He did not have the key to unlock it. He saw small screwdriver sitting on the passenger seat. (Id.) He inserted that screwdriver into the lock area on the center console, and it opened. (Id.)

He could see the trunk lock switch.  He flipped it, pushed a button on the dash, and the trunk opened.  (Id.)

Sgt. Wilcynski saw two suitcases in the trunk.  (Tr.20).  Both were padlocked.  (Id.)  He asked Mr. Kasper how to unlock them.  Rather than give a verbal response, Mr. Kasper shrugged his shoulders.  (Id.)  Trooper Lewis and Sgt. Wilcynski used a pair of pliers to open the padlocks on the suitcases.  (Id.)  Those suitcases contained a total of fifteen packages of marijuana.  (Tr.21).  The packages weighed approximately twenty-seven pounds.  (Claimant's Brief, p. 1, ¶2).

Mr. Kasper was handcuffed, arrested and placed in the cage area of Sgt. Wilcynski's patrol car.  (Tr.22).  Sgt. Wilcynski continued searching the passenger compartment of the front seat area of the vehicle.  (Tr.24).  He noticed some fabric that did not appear to belong to the vehicle in the roof of the passenger compartment.  (Tr.24).  He grabbed at the fabric.  That caused some of the surrounding plastic molding to fall off.  That, in turn, revealed a little red bag.  (Id.)  It contained the key that was supposed to be attached to the key fob–the key that would unlock the trunk.  (Tr.25).

According to Sgt. Wilcynski, the tow truck and Trooper Lewis arrived at the scene at about the same time.  (Tr.26)  When the tow truck arrived, Mr. Kasper was not under arrest, but he was not free to leave,  as the Sergeant believed he had reasonable suspicion to detain Mr. Kasper.  (Tr.26-27).  He provided the following basis:  Mr. Kasper told the Sergeant he had been in Reno, Nevada partying for four days.  (Tr.28).  Yet, he was to have been home four days' earlier, on Monday.  That is why his friends had called the police.  The Sergeant believed Mr. Kasper's story translated into a one-day trip: Illinois to Reno and back in one day.  (Tr.28-29).

Sgt. Wilcynski believed Mr. Kasper was being deceptive when Mr. Kasper said the reason he had so little clothing in the car for a four-day trip was because he "is a guy". (Tr.29). In his almost fifteen years with the Patrol, he had never come across an individual who could not open his trunk because his car had stalled. (Id.) In response to Mr. Kasper's question as to why the Sergeant wanted to search his vehicle, he told Mr. Kasper the interstate crosses the entire country, and law enforcement has problems with people transporting things they shouldn't be. (Tr.30). In response, Mr. Kasper said he never did drugs; he thought they were disgusting. (Id.) Sgt. Wilcynski's suspicion was peaked when Trooper Bauer said Mr. Kasper had told him (Bauer) Mr. Kasper had been in Reno for a car show, while Mr. Kasper had told Sgt. Wilcynski he had been in Reno to party with some friends. (Tr.31).

Russell Lewis has been employed by the Nebraska State Patrol since September, 1998. He has been assigned to the police service dog division since June, 2003. He has been a certified law enforcement officer since February, 1999. (Tr.33-34). Trooper Lewis and his police service dog, Bruno, came together in January, 2008. (Tr.34). They were certified by the State of Nebraska in January, 2008, and in September, 2009. (Tr.37). Bruno is a passive indicator, meaning he will sit and stare, stand and stare, or lie down and stare, at the source of an odor of a controlled substance. (Tr.38). When Bruno observes the odor of a controlled substance, his indication is preceeded by an alert. (Id.) During his normal search pattern, Bruno will alert to the odor of narcotics by exhibiting a change in demeanor. In other words, he will deviate from his normal search pattern. (Id.) Trooper Lewis said Bruno and he generally sniff a vehicle going in a counter-clockwise direction around the exterior of the vehicle. (Id.) Bruno may deviate from the counter-clockwise direction, such as going in a clockwise direction, staying at one

portion of the vehicle, or focusing his sniffing on one portion of the vehicle. (Tr.38-39). Then, if Bruno can locate the strongest source of the odor, his prescribed indication behavior is to sit and stare at the source of that odor. (Tr.39). He may also stand or lie down as an indication, meaning Bruno may stand and stare at the source of the odor or lie down and stare at the source of the odor. (Id.)

Trooper Lewis maintains written records for Bruno's deployments, to include street deployments and any training and certification Bruno and he go through. (Id.) Bruno has been trained to indicate to the odors of marijuana, methamphetamine, cocaine and heroin. (Id.) In addition to the annual re-certification process, Trooper Lewis and Bruno train one day a week with other canine handlers. (Tr.40). Additionally, the two of them train with a certified instructor once a month. (Id.)

On August 6, 2009, State Patrol Dispatch reached Trooper Lewis at his home, informing him Sgt. Wilcynski had requested a police service dog. (Id.) Trooper Lewis went on duty, in uniform and in a marked patrol car. (Tr.40-41). Once he arrived at the scene, he spoke with Sgt. Wilcynski, who informed Trooper Lewis the driver of the vehicle had denied consent to search. Sgt. Wilcynski asked him to deploy his dog around the vehicle. Trooper Lewis removed Bruno from his patrol unit. (Tr.41). They proceeded in a counter-clockwise direction around the exterior of the vehicle. Bruno gave an alert and a standing indication on both the trunk and the rear passenger side door handle. (Id.) The two of them then completed the exterior vehicle sniff. Trooper Lewis informed Sgt. Wilcynski the dog had indicated to the vehicle. (Id.) After the marijuana was located in the trunk of the vehicle, Trooper Lewis left the scene.

Bruno is Trooper Lewis' third dog.  With his first two police service dogs, the dog and he went through a five- to six-week training camp prior to certification.  (Tr.43-44).  Trooper Lewis did not go through the five week camp with Bruno, because he, himself, had five years' experience, and Bruno had four years' experience.  (Tr.59).  But the Patrol determined Trooper Lewis and Bruno would train with a certified instructor until they became accustomed to each other, then the two were required to go though the certification process just as they would have been required to do had they gone through a camp program.  (Id.)  Trooper Lewis and Bruno did go through the certification process after their month-long training, and they were certified.  (Tr.60).

For a perfect indication during a certification, Bruno should go into a sit and stare indication.  (Tr.45).  If Bruno does not present that type of behavior during a certification, he would receive a lower grade.  (Tr.45-46).  However, lying down and staring, or standing and staring, is also acceptable.  (Tr.46).  Trooper Lewis said a dog does not have to demonstrate an indication for a certain about of time.  (Tr.46).  Rather, the dog must demonstrate the behavior long enough for the judge (in a certification) to determine the dog has sufficiently and correctly located the odor, and long enough for the handler to identify that to the judge.  (Id.)

Trooper Lewis reviewed his performance documentation for Bruno's activity on August 6, 2009.  (Tr.51).  He scores his dog's performance by giving it a one though six.  (Id.)  One is perfect.  (Id.)  For Bruno's performance when the dog sniffed Mr. Kasper's vehicle, Trooper Lewis gave the dog a four on difficulty, a two on searching, and a four on indication.  (Tr.52). Trooper Lewis testified this numbers-rating system is based on his experience with Bruno.  (Tr. 54).  He said typically a three is the average police dog.  He said he believed he is a little more

stringent with Bruno, because of his (Lewis') experience level. (Id.) In Trooper Lewis's opinion, Bruno is better than average, so when he rates Bruno a three, that is not the average police dog; that is Bruno. (Id.)

The marijuana found in Mr. Kasper's vehicle was vacuumed-sealed in a suitcase inside the trunk. (Tr.61). Trooper Lewis graded that difficulty as a four, as opposed to a one, which might be marijuana situated on a table in plain view. It is harder for the odor to escape when it is inside a heat-sealed bag, inside a suitcase, inside a trunk, covered by blankets and clothing. It is more difficult for the dog. (Tr.62).

When scoring a dog on its searching ability, Trooper Lewis looks to how intense or how focused a dog is while it is conducting the sniff around the vehicle. (Id.) He gave Bruno a score of four for the indication to Mr. Kasper's vehicle because it was a standing indication, as opposed to Bruno's prescribed indication, which is a sit. (Id.) A score of four is a passing score during a certification; however, Bruno's standing indication was not a perfect indication by Bruno during that sniff. (Id.)

Bruno has indicated when troopers have not found physical evidence of drugs. (Tr.63). Trooper Lewis said there have been many times when Bruno has indicated, but no physical of evidence of drugs was found. In those cases, though, Trooper Lewis has discovered either the driver or someone in the vehicle possessed drugs or had been smoking drugs in the vehicle. (Id.)

Trooper Lewis said Bruno's average indication score during certification was 2.6 or 2.7. (Tr.66). A dog is taught a prescribed indication method by posturing the dog in that prescribed indication method until the dog understands when it encounters the odor, it is to react in whatever manner it has been trained, i.e, that postured position. (Tr.66). During training, the

posturing is done repeatedly to make sure the dog understands the handler wants the dog to demonstrate that behavior. (Id.) Having said that, it is still an indication if Bruno does something other than the prescribed method, as long as the dog does not leave the odor. Bruno stands and stares at the source of the odor; he does not leave it. He quits his search pattern, but stays at the source of the odor (Tr.67). Trooper Lewis differentiates Bruno's activity as an indication (such as "stand and stare" or "sit and stare") from simply an activity a dog does (such as sitting, standing or lying down) because the former is proceeded by an alert. (Tr.67). It is the alert first that makes next action an indication. (Id.) And, an alert is a change in behavior and course. (Id.) Additionally, there is no prescribed period of time Bruno has to "stand and stare" or "sit and stare" or "lie down" for Trooper Lewis to recognize any of those behaviors as an indication. (Tr.67-68).

## Argument

### I. Sgt. Wilcynski did not Illegally Detain Mr. Kasper During their Encounter.

An officer may conduct an investigation that is reasonably related in scope to the circumstances that initially justified the stop. United States v. Fuse, 391 F.3d 924, 920 (8th Cir.2004). Additionally, the officer may ask routine questions such as the destination, route and purpose of the trip and whether the officer may search the vehicle. United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999). The occupants of the vehicle may be detained while the officer completes a number of routine but somewhat time-consuming tasks..., such as computerized checks of the vehicle's registration and the driver's license and criminal

history ... . Id. "To continue to detain a vehicle's occupants after the initial stop is completed, an officer must have been aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." United States v. Shafer, 608 F.3d 1056, 1062 (8th Cir. 2010) (quotation omitted). "Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances, in light of the officer's experience." Id. (quoting United States v. Gill, 513 F.3d 836, 844 (8th Cir. 2008). Mr. Kasper's statements alongside the interstate were internally contradictory: He told Sgt. Wilcynski he had been in Reno, Nevada partying for four days with his buddies, while he told Trooper Bauer he had been Reno because of a car show. He told Sgt. Wilcynski he had just recently replaced the belt of his engine, but upon Sgt. Wilcynski's view of that belt, he believed it was worn and not new. Sgt. Wilcynski believed Mr. Kasper was being deceptive when he provided a flippant response to Sgt. Wilcynski's observation Mr. Kasper did not have much clothing to take a four-day trip. Mr. Kasper could not open the trunk to his own car. In Sgt. Wilcynski's almost fifteen years with the Nebraska State Patrol, he had never encountered a situation where a stalled engine resulted in a locked trunk. These contradictory statements provided Sgt. Wilcynski with reasonable, articulable suspicion of criminal activity. See United States v, Bracamontes, 2010 WL 3034676, *2 (C.A.8 (Neb.) August 5, 2010) ("Bracamontes' statements are internally contradictory and contradicted his wife's account of their journey, thus establishing the requisite reasonable suspicion to detain him for further investigation.")

Sgt. Wilcynski did detain Mr. Kasper when he told him he was going to call for a dog. United States v. Beck, 140 F.3d 1129, 1135–1136 (8th Cir. 1998) (reasonable person would not

11

feel free to leave after being informed officer intends to subject vehicle to dog sniff).  But the reasonable, articulable suspicion of criminal activity gave Sgt. Wilcynski the authority to continue to detain Mr. Kasper.  "If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has justification for a greater intrusion unrelated to the traffic offense."  United States v. Lyons, 486 F.3d 367, 371 (8th Cir. 2007).   The "greater intrusion" in Mr. Kasper's case was Sgt. Wilcynski calling for a drug dog.

**II. The Defendant Vehicle is Forfeitable as Facilitating Property.**

The United States has alleged the Defendant vehicle is forfeitable to the United States pursuant to Title 21, United States Code, Section 881(a)(4):  "The following shall be subject to forfeiture to the United States and no property rights shall exist in them: ... all conveyances, including aircraft, vehicles or vessels, which are used, or are intended for use, to transport, or in any manor to facilitate the transportation, sale, receipt, possession or concealment of [controlled substances used in violation of Title 21]."  "This forfeiture provision is subject to the standards set forth in the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 983." United States v. Dodge Caravan Grand SE/Sport Van, 387 F.3d 758, 761 (8th Cir. 2004).  "The Act places the initial burden on the government of proving by a preponderance of the evidence that the defendant property is subject to forfeiture.  18 U.S.C. § 983(c)(1).  ... CAFRA requires the government to establish that there was a substantial connection between the property and the offense."  Id. (citations omitted).

In United States v. Premises Known as 3639–2nd Street N.E., 869 F.2d 1093 (8th Cir. 1989), the Eighth Circuit reviewed a case involving the forfeiture of a personal residence and

12

money.  An undercover officer had purchased cocaine in the residence from the owner.  Id. at 1094–1095.  Thereafter, through the execution of a search warrant, police recovered drugs, drug paraphernalia, a large amount of currency, guns and ammunition.  Id. at 1095.  The Government filed a forfeiture action against the residence, pursuant to Title 21, United States Code, Section 881(a)(7), which "provides in relevant part for the forfeiture of all real property 'which is used, or intended to be used, in any manner or part, to commit, or facilitate the commission of, a violation of this Title punishable by more than one year's imprisonment.'"  Id. at 1094, n.1.  The Circuit found the property forfeitable:

> The drug sale itself and exchange of money occurred in [the Claimant's] house. Moreover, drugs as well as marked money from prior transactions and tools-of-the-trade were found in the house." Id. at 1096.  The term "facilitate", as used in the context of the forfeiture statute, has been interpreted to encompass activity making the prohibitive conduct less difficult or "more or less free from obstruction or hindrance".  ... The mere use of the house for drug storage and concealment clearly made the sale of cocaine less difficult.  Moreover, the house as a structure itself was actually used in the commission of the offense.

Id. at 1096–1097 (citations omitted).

The same analysis should be applied to the case at bar.  Mr. Kasper's driving down Interstate 80 while possessing and transporting approximately twenty-seven pounds of marijuana was certainly easier for him to do than walking down the Interstate carrying the same amount of marijuana.  Moreover, Mr. Kasper used the Defendant vehicle to store and conceal the marijuana as he drove along the Interstate.

In United States v. One 1982 Chevrolet Corvette, 976 F.3d 392 (8th Cir. 1992), the Eighth Circuit affirmed a district court's order of forfeiture of the defendant vehicle.  Part of the evidence at trial was "a confidential informant's report that [the Claimant] used the Corvette to

13

retrieve cocaine from his stash". Id. at 393.  The district court had found probable cause that the claimant had used the Corvette to transport or facilitate the transportation, sale, receipt, possession or concealment of cocaine. Id.  In addressing the claimant's defense, the Court of Appeals noted the Claimant did not "offer any explanation how he traveled to and from his stash without using his Corvette ... ." Id.

In United States v. One Blue 1979 AMC Jeep CJ–5, 783 F.2d 759 (8th Cir. 1986), the district court had determined the defendant vehicle was forfeitable to the United States.  One of the owners of the defendant vehicle had driven it to several meetings with co-conspirators to discuss the use of and a proposed purchase and sale of narcotics. Id. at 761.  The district court had determined using the vehicle to transport that owner to meetings involving the sale of drugs was sufficient to support the Government's burden, *albeit* at the pre-CAFRA probable cause level. Id.  Nevertheless, the Eighth Circuit affirmed the decision, stating, "The Government bears the burden of going forward in a forfeiture proceeding, but it must establish only that reasonable grounds exist to believe that the vehicle [was] used or [was] intended to be used for prohibitive purposes.  ... The property is subject to forfeiture if it was used 'in any manner' to facilitate the sale, receipt, possession or transportation of a controlled substance. Id. (citations omitted).

In United States v. One 1980 Red Ferrari, 875 F.2d 186, 188 (8th Cir. 1989), the Claimant, David Adcock, "had cocaine in his possession while driving the Ferrari.  Although Adcock argues his mere possession of cocaine while in the vehicle is insufficient evidence that the vehicle was used in violation of the federal forfeiture statute, the express language of the statute indicates that the use of a vehicle 'to transport, or in any manner to facilitate the transportation, sale, receipt, possession or concealment' of a controlled substance warrants forfeiture.  In light of

14

this language, it is clear that Adcock's use of the Ferrari to transport the cocaine on this person constituted a violation of the forfeiture statute. Nor do we find any merit in Adcock's related contention that the Ferrari should not be subject to forfeiture because Adcock was carrying only a small amount of contraband suitable for personal use. The courts have uniformly held that a vehicle is subject to forfeiture no matter how small the quantity of contraband found." Id. (citations omitted).

On August 9, 2009, Benjamin Kasper had approximately twenty-seven pounds of marijuana in the trunk of his BMW as he was traveling down the Interstate. That BMW, the Defendant vehicle, facilitated the receipt, possession, concealment and transportation of marijuana.

### III. Whether Mike Joyce is an Innocent Owner of the Defendant Property, Within the Purview of Title 18, United States Code, Section 983(d).

"The Government bears the initial burden of proving probable cause to connect the property to drug trafficking. After the Government makes this showing, the burden shifts to the claimant to show by a preponderance of the evidence that the property is not connected with drug trafficking or that some defense to forfeiture applies." United States v. Premises Known as 7725 Unity Ave. N., 294 F.3d 954, 958 (8th Cir.2002).

Under CAFRA, the innocent owner defense has been codified at Title 18, United States Code, Section 983(d)(1): "An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute. The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence." Section 983(d)(2)(A) further defines innocent owner: With respect to a property interest in existence at the time the illegal conduct

15

giving rise to the forfeiture took place, the term "innocent owner" means an owner who (i) did not know of the conduct giving rise to the forfeiture or (ii), upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected to terminate such use of the property. Neither Mr. Kasper, nor Mike Joyce, can meet this burden.

"In a forfeiture case, a claimants's Article III standing turns on whether the claimant has a sufficient ownership interest in the property to create a case or controversy. This threshold burden is not rigorous: To have standing, a claimant need not prove the underlying merits of the claim. The claimant need only show a colorable interest in the property, redressable, at least in part, by a return of the property." United States v. One Lincoln Navigator, 328 F.3d 1011, 1013 (8th Cir. 2003) (citation and inner quotations omitted).

Mike Joyce is not a party to this lawsuit. He has not filed a Claim or an Answer asserting any interest in the Defendant vehicle. Mike Joyce, and whatever interest he may have in the Defendant vehicle, is not mentioned once in the Hall County District Court transcript (Filing No. 24), which is the evidence upon which this Court will base its decision.

The only mention of Mike Joyce is in Mr. Kasper's trial brief–that Joyce apparently has a lien on the Defendant vehicle's title which secures a debt of Mr. Kasper. But that is argument, not evidence. Mr. Kasper has failed to prove Mike Joyce has any ownership interest in the Defendant vehicle. Therefore, Mike Joyce has no standing to assert an innocent owner defense to the Defendant vehicle. One Lincoln Navigator, 328 F.3d at 1013.

## Conclusion

For the reasons stated herein, the Plaintiff, United States of America, respectfully requests this Court find the United States has shown, by a preponderance of the evidence, the Defendant vehicle was used to facilitate the transportation, receipt, possession and concealment of marijuana, a controlled substance.  The United States also requests this Court find Benjamin Kasper has not demonstrated, by a preponderance of the evidence, Mike Joyce is an innocent owner of the Defendant vehicle, and further find whatever interest Mike Joyce may have in the Defendant vehicle is extinguished and forever barred.  The United States requests this Court find the Defendant vehicle is forfeited to the United States pursuant to Title 21, United States Code, Section 881(a)(4).

    Respectfully Submitted,
    UNITED STATES OF AMERICA,
    Plaintiff

    DEBORAH R. GILG
    United States Attorney

By:   *s/Nancy A. Svoboda*
    NANCY A. SVOBODA (#17429)
    Assistant United States Attorney
    1620 Dodge Street, Suite 1400
    Omaha, Nebraska  68102-1506
    (402) 661-3700

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify on September 21, 2010, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following: Glenn A. Shapiro, Attorney at Law

    *s/Nancy A. Svoboda*
    NANCY A. SVOBODA
    Assistant United States Attorney