IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:10CV15 |
| | ) | |
| V. | ) | |
| | ) | |
| 2002 BMW 745I, VIN WBAGL63422DP51620, | ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendant. | ) | |

Pursuant to the parties' consent, this case is pending before me for final disposition.[1] The plaintiff, United States of America, has filed a complaint for forfeiture of the defendant vehicle, 2002 BMW 745i, VIN WBAGL63422DP51620 (the "BMW") (filing no. 1). Claimant Benjamin Kasper filed an answer, (filing no. 11), and alleges the evidence seized which implicates and supports forfeiture of the BMW was obtained in violation of Mr. Kasper's Fourth Amendment right to be free from unreasonable searches and seizures. Although not stated in Mr. Kasper's answer, his trial brief also asserts an innocent owner defense on behalf of Mr. Mike Joyce. The parties agreed to have the matter determined on documentary evidence submitted in conjunction with their respective trial briefs. For the reasons set forth below, the court denies Mr. Kasper's claims and finds the BMW shall be forfeited to the United States.

BACKGROUND

On August 6, 2009, Nebraska State Patrol Sergeant Jeff Wilcynski was on duty and driving a marked patrol car at approximately mile marker 305 of Interstate 80 in Hall County,

---

[1]See filing no. 14, "Consent to Exercise of Jurisdiction by a United States Magistrate Judge and Order of Reference," and 28 U.S.C. § 636(c).

Nebraska. He was driving behind a blue BMW when the BMW slowed to 50 miles per hour, turned on its hazard lights, and pulled onto and parked on the shoulder of the road. Sgt. Wilcynski activated his squad car lights and pulled off the road, parking directly behind the BMW.

Sgt. Wilcynski approached the BMW and initiated a discussion with Mr. Kasper, the driver and sole occupant of the BMW. Mr. Kasper indicated he had "blown out" his fan belt earlier and an error message indicating something was wrong with the transmission was displayed on the dashboard. Sgt. Wilcynski asked Mr. Kasper if he would like the Sergeant to call a tow truck, but Mr. Kasper said he was not sure a tow truck was needed at that time and he wanted to look under the hood first. Sgt. Wilcynski asked for identification and Mr. Kasper handed Sgt. Wilcynski his Illinois driver's license.

Just prior to handing Sgt. Wilcynski his identification, Mr. Kasper stated his "buddies have been looking for [him] for the past couple of days" and might have called the police. When asked why, Mr. Kasper explained his cell phone was dead, and he thought they had been trying to call him because he was supposed to be home from his trip four days earlier. He indicated he was supposed to be home on Monday. The stop occurred on a Thursday.

Mr. Kasper released the hood and Sgt. Wilcynski and Mr. Kasper went to the front to examine the vehicle. Mr. Kasper indicated he recently replaced the fan belt on the car; however, Sgt. Wilcynski did not think any of the belts appeared to have been recently replaced. There was no other obvious problem with the car.

While they were examining the engine, Sgt. Wilcynski asked Mr. Kasper where he was coming from. Mr. Kasper responded that he had been in Reno, Nevada. When asked what he was doing in Reno and how long he was there, Mr. Kasper responded he was partying with some friends and he had been gone for four days. He also mentioned there was a car show

in Reno every year, although it is not clear from the video and audio of the encounter that Sgt. Wilcynski heard the comment about the car show.

Mr. Kasper attempted to restart the BMW, but it would not turn over. At Mr. Kasper's request, Sgt. Wilcynski called a tow truck. After calling for the tow truck, Sgt. Wilcynski and Mr. Kasper engaged in general conversation about Mr. Kasper's work and some current health problems Mr. Kasper was experiencing. Sgt. Wilcynski asked Mr. Kasper if he had any documentation for the car because when Sgt. Wilcynski called in the plates, dispatch did not have any information from him. Mr. Kasper retrieved a manilla envelope, the contents of which properly tied Mr. Kasper to ownership of the BMW.

Sgt. Wilcynski also asked Mr. Kasper where his luggage for the trip was located. Mr. Kasper pointed to a few articles of clothing in the back seat and indicated that was all he had, noting he did not need much because "I'm a guy." Sgt. Wilcynski also asked what was in the trunk, and Mr. Kasper responded "clothes and other [stuff]." Sgt. Wilcynski asked for permission to look in the trunk and Mr. Kasper agreed. However, Mr. Kasper could not open the trunk. Neither the fob on the key ring, nor the button on the dash designated to open the trunk would unlatch the trunk. Sgt. Wilcynski asked if he could have a drug dog come around the outside of the vehicle before the tow truck arrived to make sure "there were no drugs in the car." Mr. Kasper consented and indicated that he did not do drugs and that there were no other drugs in the car besides some prescription medication. Mr. Kasper also consented to allow Sgt. Wilcynski to search the inside of the car. Mr. Kasper was ordered to stand in front of Sgt. Wilcynski's car while he searched the BMW and continued to attempt to open the trunk.

While Sgt. Wilcynski was searching the BMW and searching for a way into the trunk, Nebraska State Trooper Bauer arrived on the scene.[2] Sgt. Wilcynski requested Trooper Bauer "go talk to [Mr. Kasper]." It is unclear from the evidence where Mr. Kasper was located at that time.[3] Trooper Bauer returned to the area where Sgt. Wilcynsiki was searching the BMW. Trooper Bauer informed Sgt. Wilcynski that he did not believe Mr, Kasper's story that he stayed at Circus Circus hotel in Reno. At that time, Trooper Bauer did not believe a Circus Circus was located in Reno. Sgt. Wilcynski continued the search of the BMW, but was still unable to access the trunk. A few minutes after Sgt. Wilcynski initiated the search, Trooper Bauer informed him that Mr. Kasper had withdrawn his consent to the vehicle search because he was concerned Sgt. Wilcynski would break something. Sgt. Wilcynski stopped the search at that time.

Trooper Russell Lewis and his police service dog, Bruno, arrived at the scene at approximately the same time as the tow truck, approximately 14 minutes after Trooper Lewis had been summoned to the scene. Bruno has been trained and certified to detect the odor of drugs since February of 1999. Although Bruno's typical indication behavior was to sit and stare at the drug odor's source, he also reliably indicates by lying down and staring, or standing and staring at the source of the odor. In other words, Bruno indicates to the odor of drugs by stopping and staring at the source of a drug odor, and although he usually sits, he sometimes stands or lies down while doing so.

Trooper Bauer instructed the tow truck to wait to hook up the BMW until Trooper Lewis and Bruno completed the external sweep of the vehicle. The canine sniff lasted

---

[2] It is not clear from the record whether Trooper Bauer was called in as back-up or stopped on his own accord.

[3] The video evidence suggests Mr. Kasper was placed in Trooper Bauer's car, but Sgt. Wilcynski testified that he was still standing outside the car's during Sgt. Wilcynski's initial search.

approximately one minute and thirty seconds. Trooper Lewis signaled to Sgt. Wilcynski that Bruno indicated drugs were present in the trunk, at which point Sgt. Wilcynski and Trooper Bauer again attempted to access the trunk. They eventually located a switch inside the center consol allowing them to release the trunk latch. Once the trunk was open, the officers found two locked suitcases. They were able to break the locks and found a total of 15 packages of marijuana. Mr. Kasper was subsequently arrested and the BMW was impounded by the law enforcement officials.

## LEGAL ANALYSIS

The United States alleges that the BMW is forfeitable property under 21 U.S.C.A. § 881(a), which provides as follows:

> (a) The following property shall be subject to forfeiture to the United States and no property right shall exist in them:
>
> . . .
>
> (4) All conveyances, including aircraft, vehicles, vessels, which are used, or are intended for use, to transport, or in any manner facilitate the transportation, sale, receipt, possession, or concealment of [controlled substances].

21 U.S.C.A § 881(a)(4). In such cases, the Government "must establish by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C.A. § 983.

A vehicle used to transport contraband falls well within the auspices of the statute. See United States v. Dodge Caravan SE/Sports Van, 387 F.3d 758 (8th Cir. 2004); United States v. One 1982 Chevrolet Corvette, 976 F.2d 392 (8th Cir. 1992); United States v. One 1980 Red Ferrari, 875 F.2d 186 (8th Cir. 1989). The BMW was found with substantial amounts of marijuana in its trunk and was used to transport the controlled substance.

Assuming the officers' conduct in finding the marijuana was lawful under the Fourth Amendment, and Mr. Kasper's cannot validly raise an innocent owner defense, the BMW is subject to forfeiture.

### A. Mr. Kasper's Fourth Amendment Rights.

"The Fourth Amendment's exclusionary rule applies to quasi-criminal forfeiture proceedings." United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 646 (8th Cir. 1999). Thus, if evidence should be suppressed because it was discovered through an impermissible search and/or seizure, the "government must prove probable cause with other, untainted evidence." Id. "A 'search' occurs when an expectation of privacy that society considers reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 133 (1984). "Seizure includes official detention of a person as well as meaningful interference with a person's possessory interests in property." $404,905 in United States Currency, 182 F.3d at 646 (internal citations omitted). In other words, if the United States violated Mr. Kasper's Fourth Amendment rights in obtaining the contraband, the exclusionary rule applies and the government will have to prove its claim of forfeiture without the evidence seized from the trunk of the BMW.

### 1. Initial Encounter.

Mr. Kasper activated the BMW's hazard lights and pulled off to the side of the interstate. Sgt. Wilcynski responded by activating his patrol vehicle lights, parking behind the BMW, and contacting the driver to determine if there was a problem. A law enforcement officer's duties include performing community caretaking functions, such as assisting distressed motorists. See, e.g., Winters v. Adams, 254 F.3d 758, 763-64 (8th Cir. 2001)(noting police officers perform "community caretaking functions" separate from the "detection, investigation, or acquisition of evidence relating to the violation of a criminal

statute"). Under the circumstances presented, Sgt. Wilcynski was lawfully carrying out his community caretaking duties when he stopped to assist Mr. Kasper, and under such circumstances, an objective person in Mr. Kasper's position would not have believed he was being detained at that time.

While conferring with Mr. Kasper at the roadside, Sgt. Wilcynski asked questions about Mr. Kasper's identity, travel schedule, and the purpose of his trip. Although the BMW was not functional at the time Sgt. Wicynski stopped, Mr. Kasper was free to disregard the questions and walk away. See United States v. $91,960.00, 897 F.2d 1457, 1461 (8th Cir. 1990). Instead, he engaged in a consensual encounter with the officer by remaining at the vehicle and responding to the officer's permissible questioning. Sgt. Wilcynski's roadside questioning did not violate the Fourth Amendment. See United States v. Griffith, 533 F.3d 979, 983 (8th Cir. 2008); United States v. White, 81 F.3d 775, 778-79 (8th Cir. 1996).

    2.    **Canine Sniff**.

Mr. Kasper asserts his Fourth Amendment rights were violated when the canine sniff was conducted on the BMW. Mr. Kasper argues the law enforcement officers lacked "reasonable and articulable suspicion to deploy the police service dog" and that he revoked any consent to the canine sniff prior to the time the K-9 unit arrived on the scene.

The canine sniff did not violate Mr. Kasper's Fourth Amendment rights for at least three reasons; specifically, the canine sniff was conducted in a public location and in the absence of any unlawful detention of Mr. Kasper's person or vehicle; the officers had reasonable suspicion to detain the vehicle to conduct a canine sniff and the detention, if any, of Mr. Kasper or the BMW to conduct the canine sniff was not unreasonable; and Mr. Kasper consented to the canine sniff and did not unambiguously and unequivocally withdraw that consent.

a. <u>Public Location</u>.

A "canine sniff of the exterior of personal property in a public location 'is so limited both in the manner in which the information is obtained and the content of the information revealed by the procedure' that it does not constitute a 'search' within the meaning of the Fourth Amendment." $404,905 in U.S. Currency, 182 F.3d at 647 (quoting United States v. Place, 462 U.S. 696, 707 (1983)). The "exterior of personal property" has consistently been found to include vehicles, including parked cars. See United States v. Friend, 50 F.3d 548, 551 (8th Cir. 1995) (overruled on other grounds) (holding a canine sniff of a parked car on a public street was not a search for Fourth Amendment purposes); see also $404,905 in U.S. Currency, 182 F.3d at 647 (holding a canine sniff of a U-Haul trailer stopped along the interstate did not implicate the Fourth Amendment); Merrett v. Moore, 58 F.3d 1547, 1553 (11th Cir. 1995) (canine sniff of the exterior of a car waiting at a roadblock was permissible without reasonable suspicion).

In this case, Mr. Kasper's vehicle broke down and was parked on the side of the interstate – clearly, an area open and accessible to the public. Thus, it was well within the authority of the law enforcement officers to conduct a canine sniff around the outside of the vehicle while the vehicle remained on the side of the road. See Friend, 50 F.3d at 551.

Although the tow truck and canine unit arrived at the scene at about the same time, and the tow truck driver was instructed to wait briefly while the canine sniff was conducted, the result delay lasted, at most, a few minutes. A de minimus delay to conduct a canine sniff is not an unreasonable detention, and it does not constitute an impermissible search. See United States v. Mohamed, 600 F.3d 1000, 1005 (8th Cir. 2010); United States v. Rivera, 570 F.3d 1009, 1013 (8th Cir. 2009).

The BMW was completely disabled at the time the canine sniff was ordered and conducted, and Mr. Kasper was unable to remove the BMW from the roadside without a tow truck. Mr. Kasper's personal freedom of movement was not delayed as a result of the canine sniff or while the canine sniff was conducted, and had the canine not indicated to the presence of a controlled substance, the BMW would have been towed without any meaningful delay. Any delay caused by conducting the canine sniff before the towing procedures could begin did not violate Mr. Kasper's Fourth Amendment rights. See, e.g., United States v. Va Lerie, 424 F.3d 694, 706 (8th Cir. 2005) (applying similar principles to the brief detention and canine sniff of a traveler's luggage); United States v. Quoc Viet Hoang, 486 F.3d 1156, 1162 (9th Cir. 2007) (finding a brief detention of a package did not violate the fourth amendment where it did not interfere with the delivery in the normal course of business without meaningful delay).

      b.    <u>Reasonable Suspicion</u>.

Even if the canine sniff had not occurred in a public setting, the law enforcement officers had reasonable suspicion to temporarily detain Mr. Kasper while the canine sniff was conducted.

A consensual encounter can escalate into the type of investigatory stop contemplated in Terry v. Ohio, 32 U.S. 1, 30 (1968) when the law enforcement officer develops reasonable articulable suspicion of criminal activity. See Griffith, 533 F.3d at 983-84 (finding law enforcement officers may convert a consensual encounter into a Terry stop if they have "reasonable articulable suspicion of criminal activity). "Reasonable suspicion requires 'that the officer's suspicion be based on particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.'" Lopez-Mendoza, 601 F.3d at 865 (quoting United States v. Jones, 269 F.3d 919, 927 (8th Cir. 2001)(internal quotations omitted)). "Whether an officer has reasonable

9

suspicion to expand the scope of a stop is determined by looking at 'the totality of the circumstances, in light of the officers experience.'" United States v. Morgan, 270 F.3d 625, 631 (8th Cir. 2002) (quoting United States v. Carrate, 122 F.3d 666, 668 (8th Cir. 1997)). "Though each factor giving rise to suspicion might appear innocent when viewed alone, a combination of factors may warrant further investigation when viewed in its totality." Morgan, 270 F.3d at 631 (citing United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994)).

Conduct producing articulable suspicion must be evaluated on a case by case basis. Reasonable suspicion may arise from contradictory statements and unusual or suspicious travel plans. See Griffith, 533 F.3d 979 at 983-84; United States v. Beck, 140 F.3d 1129, 1139 (8th Cir. 1998)(citing United States v. Wood, 106 F.3d 942, 948 (10th Cir. 1997)). Although the encounter between Sgt. Wilcynski and Mr. Kasper was initially a consensual one, Mr. Kasper's conduct and his answers to Sgt. Wilcynski's questions provided reasonable suspicion to convert the encounter to a Terry stop. Specifically, Mr. Kasper stated he recently replaced a fan belt on the BMW, but the vehicle belts appeared worn upon examination by Sgt. Wilcynski. In addition, Mr. Kasper had no visible luggage and only a few clothes in the vehicle; claimed he was unable to open the trunk of his own car, but when questioned about the lack of luggage or clothing for his trip, stated he had "clothes and other [stuff]" in the trunk; stated his friends may have called the police looking for him because his cell phone quit working; and was carrying two cellular telephones, neither of which apparently were in working order. These facts, considered in the totality, were sufficient to expand the encounter between Sgt. Wilcynski and Mr. Kasper from consensual to a Terry stop supported by reasonable suspicion.

Once Sgt. Wilcynski believed reasonable suspicion was present, he could lawfully detain the vehicle and its passengers for a reasonable period of time while a canine sniff of the BMW's exterior was conducted. See Morgan, 270 F.3d at 631. Mr. Kasper's BMW was

disabled and could not be removed from the scene. The only potential delay occurred, when the law enforcement officer asked the tow truck to wait with hooking up the vehicle while the canine sniff was conducted, and this request was made for the safety of the tow truck driver. The canine sniff took less than two minutes and did not extend the Terry stop for an unreasonable amount of time in violation of the Fourth Amendment. Id.

    c.    Consent.

Although his consent was unnecessary, Mr. Kasper consented to having a canine sniff the BMW's exterior. Once consent has been given, it may only be revoked through "an act clearly inconsistent with the apparent consent to search, an unambiguous statement challenging the officer's authority to conduct the search, or some combination of both." United States v. Sanders, 424 F.3d 768, 774 (8th Cir. 2005). In the presence of an ambiguous statement or act, a defendants failure to object to a subsequent search will be relevant in determining the scope of his consent. See United States v. Lopez-Mendoza, 601 F.3d 861, 868-69 (8th Cir. 2010).

Mr. Kasper was asked by Sgt. Wilcynski whether he could have a dog "run around" the outside of the car to search for drugs, citing the fact that Interstate 80 was a thoroughfare for drug trafficking. Mr. Kasper expressly gave his consent. He also separately gave Sgt. Wilcynski permission to conduct a search of the trunk. Mr. Kasper argues that he revoked his consent to the canine sniff. However, the evidence is at best inconclusive as to exactly what conduct the revocation covered. Although it does appear that Mr. Kasper eventually revoked his consent to the search of the inside of his car, the record provides no evidence that he ever unambiguously revoked his consent to the canine sniff. At the state court suppression hearing, Sgt. Wilcynski testified that Mr. Kasper "withdrew consent for the search" because Mr. Kasper was concerned Sgt. Wilcynski would break something. Based on Mr. Kasper's reason for wanting Sgt. Wilcynski to stop searching the BMW, it is reasonable to infer his

revocation did not include the canine sniff. Once the canine unit arrived, Mr. Kasper made no further attempt to withdraw his consent or protest the sniff, providing further evidence he did not revoke his consent to the canine sniffing the vehicle. See Lopez-Mendoza, 601 F.3d at 868-69; see also United States v. Gallardo, 495 F.3d 982, 990 (8th Cir. 2007)(finding a defendant was not deprived of the opportunity to revoke his consent even though he was placed in the back of a squad car during the search).

### 3.  Probable Cause.

Mr. Kasper argues that an indication by Bruno cannot support a finding of probable cause. Although not entirely clear from Mr. Kasper's brief, he apparently believes the officers should not have relied on Bruno's conduct as an "indication" because Bruno indicated by standing and staring, rather than sitting and staring at the trunk of the BMW.

Where a canine is trained and certified in drug detection and the handler/trainer testifies that a positive indication has occurred, the canine sniff was reliable. See United States v. Olivera-Mendez, 484 F.3d 505, 515 (8th Cir. 2007); see also United States v. Olivares-Rodriguez, ___ F. Supp. 2d ___, 2010 WL 2265661(N.D. Iowa 2010). A reliable drug detection dog's "positive indication alone is enough to establish probable cause for the presence of a controlled substance." Olivera-Mendez, 484 F.3d at 512.

Trooper Lewis, Bruno's canine handler, testified as to Bruno's training, certification and his conduct when indicating to the odor of a controlled substance. Trooper Lewis provided uncontroverted testimony that Bruno indicated in a permissible manner at the trunk of the BMW when he stood and stared at the trunk. The court therefore finds Bruno made a reliable indication to the odor of controlled substances, and Bruno's indication provided sufficient probable cause for law enforcement officers to search the BMW.

B.   **Innocent Owner Defense.**

As a defense, Mr. Kasper argues that Mike Joyce is an "innocent owner" of the BMW, preventing the forfeiture of the BMW pursuant to 18 U.S.C.A § 983(d)(1). However, Mr. Joyce has not filed a claim in this case, is not mentioned in any of the evidence, and has failed to make any showing that he has a colorable interest in the BMW. Therefore, Mr. Joyce lacks standing to assert an innocent owner defense and such a defense cannot be asserted on his behalf by Mr. Kasper. See United States v. One Lincoln Navigator, 328 F.3d 1011, 1013 (8th Cir. 2003).

Accordingly,

IT IS ORDERED:

1. The claims of Benjamin Kasper and Mike Joyce (filing no. 11) against the defendant BMW are denied and dismissed.

2. Judgment will be entered in accordance with this memorandum and order.

November 5, 2010.          BY THE COURT:

                           *s/ Cheryl R. Zwart*
                           United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.